WILLIAM A. RUSSELL & another *vs.* JOHN B. O'BRIEN.

Suffolk. March 19, 1878. — Sept. 4, 1879. AMES & MORTON, JJ., absent.

A. and B. entered into a contract for the sale and purchase of certain goods, to be shipped from a foreign port in twelve equal monthly shipments, and each shipment to be considered as a separate sale or contract; the buyer to have the right to retest the goods; sound packages to be accepted, and damaged packages, if any, to be rejected on the wharf. Eleven of the shipments were duly delivered and received. The goods composing the twelfth shipment were consigned to A. by the firm of which he had purchased them by one of a line of steamships, common carriers between the foreign port and the port where B. did business. The bill of lading, indorsed in blank, and the invoice, were received by A. by mail, and, upon the arrival of the steamship, were deposited by A. at the custom-house, and he received a permit, stating that the duties on the goods had been paid, and giving permission to deliver them, and, on payment of the freight, received from the agent of the steamship line a certificate of such payment stating that the consignee was entitled to delivery. The permit and certificate, with a written order from A., addressed to the steamship, for the delivery of the goods to B., were delivered by A. to a teamster, who was employed by B. and had orders from B. to cart away from the wharves all his merchandise whenever it should arrive, and had so carted away the eleven previous shipments. The teamster presented these papers to the delivery clerk of the steamship line, who informed him that the goods in question had not come out, but would probably be out in a day or two. He had not seen the goods, but supposed that they were there because they were on the bill of lading. On the next day, the goods, being still in the hold, were attached by an officer on a writ sued out by a creditor of A., and, on the same day

B. paid A. for the goods. Had the goods been on the wharf, the teamster would have been allowed to remove them on giving up the papers which he held, according to the custom in such cases. *Held*, in an action of replevin against the officer, that the jury would be warranted in finding a symbolical delivery of the goods, sufficient to perfect the title of B. as against the attaching creditor.

REPLEVIN of goods attached by the defendant as the property of Wing & Evans, and claimed by the plaintiffs under a sale by them. Trial in the Superior Court before *Dewey*, J., who reported to this court the case stated in the opinion.

*H. W. Putnam*, for the plaintiffs.

*A. S. Wheeler & E. W. Hutchins*, for the defendant.

GRAY, C. J. By the contract of sale * Wing & Evans agree to sell, and the plaintiffs agree to buy, about seven hundred and twenty tons of good merchantable bleaching powder, of which about sixty tons are to be shipped from England to Boston during each month of the year 1876, and each shipment to be considered and treated as a separate sale or contract. The price is fixed at one and seven-eighths cents cash in gold per pound, when landed. The sellers reserve the right to have the goods retested by a certain standard; if any parcel, so retested, proves to be under thirty-two and not under thirty per cent, the buyers are to accept it at a proportionate price; if below thirty per cent, the buyers

---

* "New York, Dec. 20, 1875. Sold to Messrs. W. Russell & Son, through E. B. Reynolds. For account of ourselves, about seven hundred and twenty tons good merchantable bleaching powder for shipment from England to Boston about sixty tons per month, January to December 1876 inclusive, at one and seven-eighths cents per pound ex vessel, cash in gold. To retest not less than thirty-two per cent by Hayes & Merrick, sellers' option. If retest is below 32 per cent and not under 30 per cent, buyers to accept such parcel at *pro rata* price. If below 30 per cent, buyers to reject such parcel. Invoice weights and tares. Shipments to be accepted by buyers, provided same does not extend over fifteen days of following month, in which case buyers to accept or reject any such shipments on being advised of date of bill of lading. Names of vessels to be given when received. Sellers not to be held accountable for any contingencies beyond their control, including suspension during the period of any strike or lock-out, or other unavoidable accidents, such as fires, &c., &c., at manufacturers' works. Sound packages to be accepted, and damaged, if any, to be rejected on the wharf. Each shipment to be considered and treated as a separate sale or contract.

"Wing & Evans."

are to reject it. Sound packages are to be accepted, and damaged, if any, to be rejected on the wharf. Eleven of the twelve monthly shipments were duly delivered and received; and the question in this case is of the title in the twelfth or final shipment, as between the buyers and an attaching creditor of the sellers.

The goods in question were purchased by Wing & Evans of a firm in England, and were by that firm shipped, consigned to Wing & Evans, by the Iberian, one of a line of steamships, common carriers of goods between Liverpool and Boston. The bill of lading, indorsed in blank, and the invoice, were received by Wing & Evans by mail, and, upon the arrival of the vessel, were deposited and left by them at the custom-house, as required by the United States customs regulations, by which the goods, though not dutiable, were required to be formally passed through the custom-house in the same manner as if dutiable.

Wing & Evans received from the custom-house a permit,* addressed to the custom-house inspector, stating that the duties on these goods had been paid, and giving permission to deliver them; and, on payment of the freight, obtained from the agent of the steamship line a certificate,† addressed to the custom-house officers in charge of the vessel, certifying that, the freight and charges upon the consignment having been paid, the consignee

---

* "Port of Boston & Charlestown, Jan. 16, 1877. To the inspector: We certify that Wing & Evans have paid or secured to be paid the duties on the merchandise contained in the following packages, in conformity to the entry thereof of this date, which merchandise was imported in the steamer Iberian from Liverpool. Permission is hereby accordingly given to deliver the same, viz. :

⟨W⟩ Q $863/1006$   One hundred and forty-four tierces bleaching powders.

"J. H. Barnes, Deputy-Collector.
" Geo. C. Davis, Deputy Naval Officer."

† "Leyland Line, No. 114 State St. Boston, Jan. 16, 1877. Bill of Lading No. 19. To the custom-house officers in charge of the steamer Iberian. Grand Junction Wharf, Pier 6.

" Wing & Evans.

" The freight and charges upon the consignment mentioned in the accompanying permit having been paid, the consignee is entitled to delivery.

" Thayer & Lincoln, Agents.
" Steamship Iberian. Arrived Jan. 14, 1877. Entry No. —— "

was entitled to delivery; and this permit and certificate, with a written order * from Wing & Evans, addressed to the steamship, for the delivery of the goods to the plaintiffs, were delivered by Wing & Evans to a teamster, who was employed by the plaintiffs and other mercantile firms, and had general orders and directions from the plaintiffs to cart away from the wharves all their merchandise whenever it should arrive, and had so carted away the eleven previous shipments.

There was evidence that all the lines of steamships from foreign ports to Boston used printed certificates in the form of that so given, and were accustomed to deliver goods to any person presenting and surrendering to their delivery clerk such certificates duly filled out, with an order from the consignee, and a custom-house permit to the custom-house inspector at their respective wharves.

The other material facts are stated in the report as follows: The teamster, upon receiving these papers, immediately went to the wharf at which the Iberian was discharging her cargo, and presented them to the delivery clerk of the steamship line, and asked him if the goods were out. The clerk said, " What goods do you want? Is it Wing & Evans's goods? " The teamster said, " It is." The clerk looked at his book, into which he copied minutes of the bills of lading as soon as vessels arrived, and asked him " if it was marked Diamond Q with a W inside? " The teamster said it was. The clerk then told him that the goods had not come out, but would probably be out in a day or two. The clerk was engaged in attending two hatches, and had to see all the goods that came out, and to place each lot by itself on the wharf. He had not then seen the goods in question, but supposed they were there because they were on the bill of lading. During this conversation the teamster held the papers in his hand; the clerk saw them, but did not see what they were; he was pretty busy at the time, and did not ask for them. It was

---

* " Boston, Jan. 16, 1877. Steamship Iberian.

" Deliver to Wm. Russell & Son 144 casks bleaching powders, consigned to us (one at custom-house).

 Q 863/1006          " Wing & Evans."

admitted at the trial, that, if the goods had then been on the wharf, the teamster would have been allowed to remove them on giving up the certificate and order to the delivery clerk, and the permit to the custom-house officer in charge of the wharf.

On the next day, the goods, being still in the hold, were attached by a deputy-sheriff on a writ sued out by a creditor of Wing & Evans; and on the same day, whether before or after the attachment did not appear, the plaintiffs paid Wing & Evans for the goods. On the day after the attachment, the teamster again went to the wharf and presented the papers to the delivery clerk, but did not get the goods, because they were in the custody of a keeper appointed by the deputy-sheriff.

The plaintiffs then sued out this writ of replevin against the deputy-sheriff. By the terms of the report, if, upon such of the above facts as are competent in evidence, the jury would be authorized to find for the plaintiffs, judgment is to be entered accordingly, with nominal damages; otherwise, for the defendant, with an order for the return of the goods.

It is unnecessary to decide whether, under the terms of the contract, and by reason of the fact that the goods were to be ordered from abroad, the sellers had authority on behalf of the buyers to appropriate the specific goods contained in the twelfth shipment to the contract at any time before the permit, certificate and order were delivered by the sellers to the teamster and by him presented to the steamship company; or whether the permit, certificate and order were of themselves such *indicia* of title, that the delivery of them was equivalent to the delivery of the goods, as in the case of a bill of lading or of a warehouse or railroad receipt.

The facts stated in the report and the evidence of the general usage of this and other foreign lines of steamships justify the inference that the permit, certificate and order' were delivered by the sellers to the teamster employed by the buyers, with the intention of passing the title in the goods. The evidence that the teamster had general directions from the buyers to cart away from the wharves all their merchandise whenever it should arrive, and that the eleven previous similar shipments had been so carted away by him and received by them without objection,

would warrant the jury in finding that the buyers, by the au thority given to the teamster, assented (if they had not done so by the contract itself) that the sellers might make the appropriation of the goods in question to the contract between the parties, as well as authorized the teamster to accept delivery of the goods. And the circumstances as to the presenting of the papers and the conversation between the teamster of the buyers and the delivery clerk of the steamship company, together with the fact admitted in the report, that, if the goods had then been on the wharf, the teamster would have been allowed to remove them, would warrant the jury in finding that the bailee in whose custody the goods were had such notice of the delivery of the papers and the passing of the title between the parties as to constitute or complete a symbolical delivery of the goods, sufficient in law to perfect the title of the buyers, even as against attaching creditors of the sellers. *Tuxworth* v. *Moore*, 9 Pick. 347. *Carter* v. *Willard*, 19 Pick. 1.

It follows that, according to the terms of the report, without considering whether, upon the facts detailed therein, and which it is unnecessary to recapitulate, the attachment was valid, there must be                                *Judgment for the plaintiffs.*